At about 5 o'clock on the afternoon of October 5th, 1940, a large police dog owned and harbored by defendant, Smith, in some unexplained manner, escaped from the back yard in which it had been confined and bit on the arms and legs, Albert Moore, Jr., aged about 12 years. Albert Moore, Sr., alleging that the dog was vicious, and that Smith knew of this, and therefore should have made certain that it could not cause injury, brings this suit against Smith, claiming on his own behalf, $50 as the cost of medical treatment required by the boy, and claiming also for the use and benefit of the boy, $2,000.
Defendant admits that he owned and harbored the dog but avers that it had not previously exhibited any vicious tendencies, and he also avers that the boy "was a trespasser and was bitten while still on the premises of defendant, after the said child had teased and aggravated the dog, and thereby contributed to his own injury."
There was judgment below dismissing the suit and Moore has appealed.
The record conclusively shows that the young boy had done nothing whatever to aggravate or tease the dog, and that in no sense was he a trespasser on the premises of defendant. He was, in fact, on the sidewalk in front of defendant's home when, without provocation, the dog rushed upon him and bit him several times. Thus, the only question which is really presented is whether or not, prior to the occurrence complained of, the dog, to the knowledge of defendant, had given evidence of vicious characteristics, because it is well settled that one who harbors a domestic animal is not liable for the results of an attack by that animal on a third person unless, to the knowledge of *Page 804 
the harborer, the animal has previously exhibited such characteristics.
In Martinez et al. v. Michel Bernhard, 106 La. 368, 30 So. 901, 55 L.R.A. 671, 87 Am.St.Rep. 306, in a syllabus by the court is found the following:
"The owner of a gentle animal, which has always been of a kind temper, and has never attempted to bite any one and has never given occasion to suspect that it would bite, is not liable in damages by the mere fact that the animal has bitten some one. * * *"
In Gillespie v. Blaise, 3 La.App. 59, in which Judge Claiborne thoroughly discussed the jurisprudence on the subject, the court said:
"In every case in our reports where the owner of an animal was held liable there was evidence that the animal was known by the owner to be dangerous or had injured someone at some prior time. * * *"
That this rule is still followed is evidenced by our opinion in Woulfe v. D'Antoni, 158 So. 394, 403, in which we said:
"The rule may be stated thus: `Notice of the animal's vicious propensity must be such as to put the owner on his guard and to require him as an ordinarily prudent person to anticipate the injury which has happened.' * * * 3 Corpus Juris, p. 96, § 327."
But it is also well settled that where such an animal has caused injury, the owner, if he is to escape liability, must show that he had no such knowledge that the animal had previously given evidence of such viciousness. In other words, the burden of proving that he did not know that the animal was vicious is on the owner. In Bentz v. Page, 115 La. 560, 39 So. 599, the court, in a syllabus, said:
"* * * It was necessary for defendant to show that the animal had always been of a kind temper, had never attempted to bite any one, and had never given occasion to suspect that he would bite; and, failing to do so, the law presumes that the defendant was in fault in not confining the animal, * * *".
In Peyronnin v. Riley, 15 La.App. 393, 132 So. 235, 236, we said:
"It may also be conceded that, when a domestic animal has caused injuries, the burden rests on him who harbors the animal to show that there have been no previous outbreaks or manifestations evidencing viciousness on its part. * * *."
Plaintiff produced no witnesses who said that they had seen the dog bite anyone else or that they had seen it exhibit viciousness, but several witnesses of plaintiff, including himself, testified that both defendant and his wife had admitted that the dog "was a bad dog" and that they were "trying to get rid of it." In fact the evidence as to this admission is so often repeated that we are urged by counsel for defendant to look upon it with suspicion, and to believe that it was concocted, and that all of the witnesses who so testified conspired together to tell the same story.
Emelda Chapman, a neighbor of the Moore family, was in the Moore home when the young boy was brought back from the clinic on the evening of the occurrence. The defendant, Smith, was present, and Emelda says that Smith said that "this dog had bitten someone else but he didn't call any name." She said, too, that on the following Sunday, Smith repeated the statement, saying: "that the dog had bitten someone else" and that Smith's wife was present when he made that statement.
Alec Andrews, a brother-in-law of Moore, says that he, too, was present when the boy was brought home from the clinic, and that at that time he heard Smith say that "the dog had bitten someone else" but that "he hated to get rid of the dog on account of his wife." Andrews, too, said that Smith had repeated that statement on the next day.
A colored preacher, Howard Alexander, who lived in the same general neighborhood, says that he was present at the clinic immediately after the attack, and that Smith "was telling Moore then, that the dog was a very bad dog, that he did want to get rid of the dog but that his wife cared for the dog * * *".
Alexander corroborated the other witnesses as to the admission made by Smith at the Moore home. He said
"That is the time he said that dog had bitten someone but who it was I don't know who it was the dog bit."
Beatrice Moore, mother of the boy and wife of plaintiff, was at the clinic when the boy was receiving treatment. She states that Smith admitted "That the dog had bitten someone else and he was trying to get rid of the dog but his wife loved the dog so much that is why he kept him." *Page 805 
She said, too, that at her home later he repeated the same thing over — "That the dog had bitten someone else and was a bad dog."
Albert Moore, Jr., the little boy, said that just after the attack, Smith's wife had said "That dog was a bad dog", and that on the next day Smith "repeated the same thing."
Albert Moore, plaintiff, also attributed to Smith an admission that the dog was vicious. He stated that while the boy was at the clinic, he asked Smith: "How you happen to keep such a bad dog?", and that the latter answered:
"I will tell you, Moore, I would have gotten rid of the dog but my wife, she loves the dog, she is fond of it, and that is why I didn't get rid of it."
And he added that Smith had also said: "I should have gotten rid of it a long time before today." Moore also said, as so many other witnesses had already stated, that on the following Sunday at his house "Smith said the same thing", and Moore said, too, that on this second occasion he had mentioned Edgar Chapron, a ladder vendor, as a man whom the dog had previously bitten. But a certain amount of doubt is thrown on this last statement of Moore because he says that he knew a ladder vendor bearing the name Edgar Chapron, but that when he asked him whether he had ever been bitten by a dog belonging to Smith, the said Edgar said "No, it wasn't him."
In addition to all of this evidence, the attorney for plaintiff called upon defendant and discussed with him a possible settlement, and he says that during this conversation Smith said to him: "The dog had bitten somebody before that, that is true."
Defendant denies that he made any of the admissions attributed to him, and he states that the dog had always been gentle and had played with all of the children in the neighborhood, including the little Moore boy. He also says that he kept an iron bar across the gate of the yard in which the dog was usually confined but he denies that he took this precaution because of any fear that the dog might escape and bite someone, explaining that he had no license for the dog and that he was afraid that it might be picked up by the authorities.
Viola Smith, defendant's wife, says that the dog had always been most gentle and had played with the children, and she denies that either she or her husband had ever said that it was vicious or that it had bitten anyone.
Two other women, neighbors of the Smiths, stated that they had often seen the dog, and that they had never heard that it was vicious, but that on the contrary, they had seen children playing with it.
One other circumstance to which reference should be made is that the dog mysteriously disappeared just at the end of the period during which the doctor had asked that it be kept carefully confined. Therefore it could not be definitely determined whether it was suffering from rabies. Counsel for plaintiff points to this disappearance as suspicious, contending that defendant disposed of it so that its vicious nature could not again manifest itself. Counsel for defendant, however, intimates that plaintiff was in some way responsible for the disappearance.
We think that there is an overwhelming preponderance of evidence in substantiation of plaintiff's contention that defendant knew that the dog had evidenced a vicious disposition prior to the attack on the little Moore boy. It is true that the District Judge reached a contrary conclusion, and we hesitate to reverse a judgment based solely on a question of fact. But the evidence is so overwhelming to the effect that Smith admitted that he knew that the animal was "bad" that we must hold that he had that knowledge. Knowing it he continued to harbor the dog at his peril.
We shall now consider the quantum of damages. Dr. Henry A. LaRocca testified that young Moore was taken to his clinic for treatment immediately after the accident; and that an examination disclosed that he had been "bitten on both legs and both arms" and that the essential medical treatment administered by him involved considerable pain and suffering. He stated further that after being treated at the clinic, the boy was sent home where "he remained in bed for approximately two weeks and was homebound for approximately three weeks", and that he, the doctor, made several visits to the home. He said that as a result of the injuries, permanent scars would remain on the limbs of young Moore.
Beatrice Moore and Albert Moore, parents of the young boy, both testified that as a result of their son's injuries, he underwent *Page 806 
considerable pain and suffering, and was confined to bed for several weeks.
Dr. LaRocca rendered a bill for $50, which amount defendant concedes is reasonable. Accordingly, the father, Albert Moore, is entitled to a judgment, on his own behalf, for that amount.
As previously stated, plaintiff has also sued for $2,000 for the use and benefit of the minor. In Bentz v. Page, 115 La. 560, 39 So. 599, where the plaintiff was bitten on the thigh, and suffered pain for several weeks, our Supreme Court awarded $300. In White v. Sens, 13 La.App. 343, 127 So. 413, this court allowed a woman $200 for pain and suffering as the result of a dog bite. In Reneau v. Brown, 9 La.App. 375, 158 So. 406, we awarded $50 to a plaintiff bitten by a dog where it appeared that his injuries were very slight. In Perez-Sandi v. Berges, 12 La.App. 191, 125 So. 185, we awarded $1,000 where a plaintiff was bitten by a dog twenty-two times, and the medical treatment involved considerable pain and suffering, and the plaintiff also was subjected to a great anxiety for a period of two weeks because of the possibility that he had been infected with rabies.
In Anderson v. D'Ingianni, 16 La.App. 560, 134 So. 412, $1,500 was awarded as damages for a dog bite causing a deep laceration which became infected, and required that the plaintiff be under the care of a physician for four or five months.
In the recent case of Tillman v. Cook, 3 So.2d 230, 231, we awarded $125 to a woman who sustained three dog bites, one about 1 1/2 inches long on the side of her neck, one three inches long on her right leg, and the third on her right arm.
In view of the foregoing cases, we feel that an award of $300, in addition to the $50 medical expense, is proper.
The judgment appealed from is annulled, avoided and reversed, and it is now ordered that there be judgment herein in favor of Albert Moore for the use and benefit of his minor son, Albert Moore, Jr., and against the defendant, Joseph A. Smith, in the sum of $300, and that there be further judgment in favor of Albert Moore, individually, and against the defendant, Joseph A. Smith, for the sum of $50, each amount to bear legal interest from date of judicial demand until paid, and for all costs.
Reversed.